UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | )   CRIMINAL NO. |
| | )   19-10198-DPW |
| v. | ) |
| | ) |
| SEBASTIAN BATISTA, a/k/a | ) |
| "Jonathan," | ) |
| | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER
July 9, 2020

After police officers instructed a cooperating witness to
arrange a drug purchase, the defendant, Sebastian Batista, drove
to the arranged meeting spot and called the cooperating witness
to let him know he was there.  The investigators then stopped
Mr. Batista's car and ordered him out of it.  The cooperating
witness identified Mr. Batista, and the investigators arrested
him.  They searched Mr. Batista's car and found 200 grams of
fentanyl under the driver's seat.

Mr. Batista has moved to suppress the fentanyl as having
been obtained in violation of his Fourth Amendment rights
because the law enforcement officers did not have either
probable cause and a warrant or exigent circumstances allowing
them to search the car.  I will deny the motion to suppress

because the investigators had reasonable suspicion sufficient to
stop the car and probable cause to search it.

## I. BACKGROUND

On February 28, 2019, investigators, including Special
Agents James B. Cryan and Tyler L. McNally of the Drug
Enforcement Administration and Detective Jason Ferranti of the
Waltham Police Department, arrested the target of a federal
investigation for trafficking fentanyl.  The target agreed to be
a cooperating witness to identify his drug supplier.

At 6:28 that evening, under the direction of Agent Cryan,
the now-cooperating witness called Mr. Batista from the
cooperating witness's living room.  The call was recorded.  The
cooperating witness asked Mr. Batista during this call if Mr.
Batista would sell him 200 grams of fentanyl.  Mr. Batista asked
where the fentanyl that he gave the cooperating witness the day
before was, and the cooperating witness said it was sold.  They
hung up.

At 6:41 PM, the cooperating witness called Mr. Batista
again.  Mr. Batista agreed to sell the cooperating witness 200
grams of fentanyl and they agreed to meet "there," which the
cooperating witness understood to mean their usual meeting site
on Pine Vale Road in Waltham.

Agent Cryan, Detective Ferranti, and the cooperating
witness drove in a law enforcement vehicle to a location closer

to the meeting site.  Agent McNally drove to the meeting
location in an unmarked police vehicle.  Agent Cryan directed
the cooperating witness to call Mr. Batista, who told the
cooperating witness that he would be there in 25 minutes.  This
call was recorded.  Agent Cryan, Detective Ferranti, and the
cooperating witness drove to the meeting site location and
parked on a side street with a view of the meeting site.  Other
investigators drove a white van, which Mr. Batista knew belonged
to the cooperating witness's drug trafficking partner, to the
meeting site itself.

At 9:00 PM, investigators drove the white van along Hardy
Pond Road towards Trapelo Road, and Mr. Batista drove a black
Jeep Cherokee in the opposite direction.  Mr. Batista called the
cooperating witness and each confirmed that the other was at the
meeting site.  Mr. Batista then called the cooperating witness
again, told him that the cooperating witness was being followed
(Mr. Batista seemed to believe that the cooperating witness was
in the white van), hung up, and sped towards Trapelo Road.

Over the radio, Agent Cryan instructed the other
investigators to stop the Jeep Cherokee.  Agent Cryan then drove
towards the Jeep Cherokee.  The investigators stopped the Jeep
Cherokee at the intersection of Pine Vale Road and Trapelo Road.
Agent McNally and Officer Neil Joyce approached the Jeep
Cherokee with their guns drawn and ordered the driver, later

identified as Mr. Batista, to step out of the car and put his hands up.

Agent Cryan pulled up to the traffic stop at Pine Vale Road and Trapelo Road shortly thereafter and observed a man outside the driver's side door.  He drove his vehicle within a few feet of the man, and the cooperating witness said, "That's him." When Agent Cryan asked, "Who?" the cooperating witness replied, "That's Jonathan," which was the name by which the cooperating witness knew Mr. Batista.

Agent Cryan reported over his radio to the agents on site that the cooperating witness had identified Mr. Batista, and the agents responded by handcuffing Mr. Batista and putting him into a law enforcement vehicle

The investigators then pulled Mr. Batista's Jeep Cherokee over to the side of the road and searched it.  They found 200 grams of fentanyl in a compartment under the driver's seat.  The investigators also recovered two cell phones from Mr. Batista's car, one cell phone rang when an officer used a different phone to dial the number the cooperating witness had used to contact Mr. Batista.

Mr. Batista has submitted an affidavit in support of his motion to suppress.  His affidavit contains no inconsistencies with the affidavits filed by the government.  He does allege a few additional facts: a police officer told Mr. Batista that his

license plate was not valid; the white van arrived at the stop
after Mr. Batista was arrested and put into a police car; Mr.
Batista heard an officer tell another that "he thought they had
stopped the wrong person;" the police searched Mr. Batista's car
for about half an hour.  The additional fact about the timing of
the white van's arrival is not material because the cooperating
witness was not in the white van, and Mr. Batista's affidavit
does not conflict with the government's affidavit evidencing
that the cooperating witness identified Mr. Batista before he
was put into the police car.  The only potentially material fact
in Mr. Batista's affidavit is his statement that an officer said
that he thought they had stopped the wrong person.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution
protects individuals from unwarranted searches and seizures by
the government.  However, the right is not absolute and there
are exceptions to it, especially in the automobile context.  The
investigators here had at least reasonable suspicion to pull the
black Jeep Cherokee over, and having done so they developed
probable cause to search the car.  Under these circumstances, I
find several exceptions to the warrant requirement apply.

### A.   *Stopping the Vehicle*

The investigators were permitted to stop the black Jeep
Cherokee because they had a reasonable suspicion that the driver

was engaged in illegal conduct.  *See U.S.* v. *Arnott*, 758 F.3d
40, 43 (1st Cir. 2014).

The validity of this kind of stop, called a *Terry* stop, is
assessed at two steps.  *Id.*  First, police may not stop the
vehicle "unless they have a reasonable, articulable suspicion
about an individual's involvement in some criminal activity."
*Id.* (citing *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968)).  Second, if
the initial stop was valid, any subsequent actions that the
police undertake "must be reasonably related in scope to the
stop itself unless the police have a basis for expanding their
investigation."  *Id. quoting United States* v. *Ruidíaz,* 529 F.3d
25, 28-29 (1st Cir.2008).

The Supreme Court recently reiterated its view that
reasonable suspicion can rest on "factual inferences based on
commonly held knowledge [officers] have acquired in their
everyday lives."  *Kansas* v. *Glover*, 140 S. Ct. 1183, 1190
(2020).  Reasonable suspicion is a "commonsense non-technical
conception[] that deal[s] with the factual and practical
considerations of everyday life on which reasonable and prudent
men, not legal technicians, act."  *Ornelas* v. *United States*, 517
U.S. 690, 695 (1996) (quoting *Illinois* v. *Gates*, 462 U.S. 213,
231 (1983) (internal quotation marks omitted).  A "reasonable
suspicion" in this context is "more than a naked hunch" but
"less than probable cause."  *Arnott*, 758 F.3d at 44 (citations

6

omitted).   In determining whether this standard has been met, I must consider "the totality of the circumstances." *Id.*   Thus, where agents had "monitored [defendant's] nefarious activities for several weeks" and his drug deals in that time period mirrored the events of the night in question, police had reasonable suspicion allowing them to stop the defendant's car. *Id.*   *See also Machado* v. *Weare Police Dep't*, 494 F. App'x 102, 105 (1st Cir. 2012 (per curiam)).

The officers here clearly had reasonable suspicion that Mr. Batista was engaging in criminal activity.   A cooperating witness at the investigator's direction had called Mr. Batista, with whom he said he had prior drug dealings, to set up this buy.   Mr. Batista drove to the location he and the cooperating witness had agreed to.   The recorded telephone calls evidenced prior drug dealings between the two, which the cooperating witness indicated took place at that location.   Agent Cryan had good reason to believe that Mr. Batista was driving the Jeep Cherokee after Mr. Batista called the cooperating witness as the Jeep Cherokee drove by the white van that Mr. Batista thought contained the cooperating witness.   The officers had, at least, reasonable, articulable suspicion that Mr. Batista was involved in criminal activity—namely, that he was dealing drugs that evening and was driving to that agreed location to deliver those drugs.   They were, therefore, not acting unconstitutionally when

they stopped the black Jeep Cherokee and ordered the driver to step out.  Given the totality of the evidence, Mr. Batista's statement that he heard an officer say he thought they had stopped the wrong person does not disturb my finding that the officers nevertheless had reasonable suspicion to stop the car.

Mr. Batista argues that the stop was unlawful because it was a de facto arrest.  "[A]ssessment of whether the agents exceeded the permissible scope of intrusion is a difficult, fact-intensive inquiry."  *United States* v. *Jones*, 700 F.3d 615, 624 (1st Cir. 2012).  Establishing that a stop became a *de facto* arrest is not easily done; "[m]easures such as the use of handcuffs, drawn weapons, placing suspects face down on the ground, the presence of multiple officers, and police cruisers positioned to block exits, do not necessarily turn a stop into a de facto arrest."  *Id.* at 625.  Moreover, the length of Mr. Batista's stop was not unreasonable or suggestive of impermissible detention.  He was pulled over, he was ordered out of his car, he was identified, and he was arrested.  The officers behaved reasonably in response to a developing situation.  *Id.*

**B.   *Searching the Vehicle***

Having lawfully stopped the car and arrested Mr. Batista, the investigators were permitted to search the car under several exceptions to the warrant requirement.

First, the investigators were permitted to search the car under the automobile exception to the warrant requirement because they had probable cause to believe that there was contraband in the car. *United States* v. *Silva*, 742 F.3d 1, 7 (1st Cir. 2014). "Probable cause exists where the totality of the circumstances demonstrates 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States* v. *Morales Torres*, 382 F. Supp. 3d 131, 135 (D. Mass. 2019) (quoting *United States* v. *Tanguay*, 787 F.3d 44, 50 (1st Cir. 2015)). In *Morales Torres*, officers were permitted to detain the defendant and search his vehicle without a warrant because the defendant arrived at the location he had arranged to meet a cooperating witness at the time they had arranged to meet, the defendant called the cooperating witness when he arrived at the location, the defendant and his fellow passenger gave conflicting answers to police questions about where they were going, and a cellphone rang inside the vehicle while the cooperating witness was calling the defendant. 382 F. Supp. 3d at 135-36. These factors amounted to probable cause that the vehicle contained contraband. *Id.* at 136. As in *Morales Torres*, investigators had probable cause to believe that Mr. Batista's car contained contraband.

Second, the investigators were also permitted to search the car as a lawful search incident to Mr. Batista's arrest. Police

officers may search "the passenger compartment as well as the contents of any containers found within the passenger compartment of a vehicle in which the defendant is found at the time of arrest." *United States* v. *Allen*, 469 F.3d 11, 15 (1st Cir. 2006). The scope of the officer's search is limited to the area that the defendant could reach without exiting the vehicle. *Id.* Where officers have sufficient reason to believe a vehicle contains drugs, they may pull the car over and arrest the occupants. *Id.* at 13-14. Thus, in *Allen*, the First Circuit upheld the district court's determination that the officers' subsequent search of the car was valid as a lawful search incident to the defendant's arrest. *Id.* at 15. *See also United States* v. *Laurent*, 607 F.3d 895, 903-04 (1st Cir. 2010)(upholding district court's denial of motion to suppress drugs found in car where "the car search was permitted because there was probable cause to suspect drugs would be found there").

The officers' search of Mr. Batista's car was lawful as incident to their arrest of Mr. Batista, given that they had probable cause to believe the car contained drugs.

Finally, even if the officers did not have probable cause to search Mr. Batista's car, I would not suppress the drugs because they would inevitably have been discovered when Mr. Batista's car was towed after his arrest. "Evidence which comes

to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." *United States* v. *Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

It is standard policy for the Waltham police department to inventory the contents of a car before towing and impounding it. As a consequence, there were independent lawful grounds for a search of Mr. Batista's car, pursuant to which the car would have necessarily been searched and the drugs inevitably found after he was arrested.

## III. CONCLUSION

For these reasons, I DENY the motions [Dkt. Nos. 41 and 59] filed by Mr. Batista's successive counsel to suppress the fruits of the stop and search of his vehicle.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE